IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| SUSAN CRISMOR, | ) | Case No. 1:26-cv-00096-SL |
| | ) | |
| Plaintiff, | ) | CHIEF DISTRICT JUDGE SARA LIOI |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | REUBEN J. SHEPERD |
| COMMISSIONER OF | ) | |
| SOCIAL SECURITY, | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| Defendant. | ) | |

## I. Introduction

Plaintiff, Susan Crismor ("Crismor") seeks judicial review of the final decision of the Commissioner of Social Security, denying her applications for disability insurance benefits ("DIB") and supplemental security income ("SSI") under Titles II and XVI of the Social Security Act. This matter is before me pursuant to 42 U.S.C. §§ 405(g), 1383(c)(3), and Local Rule 72.2(b). Because the Administrative Law Judge ("ALJ") applied proper legal standards and reached a decision supported by substantial evidence, I recommend that the Commissioner's final decision denying Crismor's applications for DIB and SSI be affirmed.

## II. Procedural History

Crismor filed for DIB and SSI on October 15, 2013, alleging a disability onset date of January 1, 2012. (Tr. 499-506). The claims were denied initially and on reconsideration. (Tr. 414-29, 432-43). She then requested a hearing before an ALJ. (Tr. 444-45). Crismor (represented by counsel) and a vocational expert ("VE") testified before ALJ Scott Canfield on July 20, 2015.

(Tr. 262-323). On December 30, 2015, ALJ Canfield issued a written decision finding Crismor not disabled. (Tr. 388-408). The Appeals Council remanded the matter back to the ALJ on October 19, 2016. (Tr. 409-12). A second hearing before ALJ Canfield was held on August 1, 2017. (Tr. 223-63). ALJ Canfield again issued a written decision finding Crismor not disabled on December 5, 2018. (Tr. 8-33). The Appeals Council declined review on October 16, 2019. (Tr. 1-7).

Crismor then appealed the decision to the United States District Court and the parties stipulated to a remand back to the Agency on December 11, 2024. (Tr. 1396; *see also Crismor v. Comm'r of Soc. Sec.*, 1:24-cv-1821-JPC, ECF Doc. 9, (N.D. Ohio Dec. 11, 2024)). On April 8, 2025, the Appeals Council remanded for a new hearing, (Tr. 1426-33), held before ALJ Joseph Hajjar on August 7, 2025 (Tr. 1373-95). During this hearing, Crismor requested the Agency consider a closed period of benefits from December 4, 2013 through June 18, 2019. (Tr. 1377-78, 1346). ALJ Hajjar found Crismor not disabled on November 7, 2025, making this hearing decision the final decision of the Commissioner. (Tr. 1343-71; *see also* 20 C.F.R. §§ 404.955, 404.981). Crismor timely filed this action on January 14, 2026. (ECF Doc. 1).

## III. Evidence

### A. Personal, Educational, and Vocational Evidence

Crismor was 39 years old on the alleged onset date, making her a younger individual according to Agency regulations. Later, she changed to an individual closely approaching advanced age on November 30, 2022. (*See* Tr. 1360-61). She graduated from high school. (*See* Tr. 1361). She did not have past relevant work. (Tr. 1361). However, she engaged in substantial gainful activity from July 2, 2019 through the date of the ALJ's decision on November 7, 2025. (Tr. 1348-49).

### B. Relevant Medical Evidence[1]

On December 4, 2013, Crismor was involved in a motor vehicle accident. (Tr. 793-96). A CT scan that day revealed cervical spondylosis, but no acute cervical spine fracture. (Tr. 825). She was released from the emergency department with a diagnosis of contusion, provided with a prescription of oxycodone-acetaminophen for pain, and recommended to follow up with primary care. (Tr. 793).

On December 12, 2013, Crismor met with Stephen D. Helper, M.D., complaining of intermittent and fluctuating left knee pain. (Tr. 878). Insurance had denied her an MRI. (*Id.*). She had been referred to physical therapy and took Vicodin for pain, but saw no improvement in her knee pain. (*Id.*). X-rays from December 10, 2013, revealed no appreciable fractures or dislocations, and demonstrated adequate strength. (*Id.*). Dr. Helper determined Crismor had an irritated nerve causing radiating pain in her left leg; she elected to proceed with a cortisone injection in the peroneal nerve, and tolerated the procedure well. (Tr. 880). Dr. Helper recommended follow up in one month. (*Id.*).

On January 2, 2014, Crismor met with David Feldman, M.D., for medication management to treat major depression, panic disorder, and acute stress reaction following her car accident in December 2013. (Tr. 843). She reported that a friend had recently died, that she had poor sleep, and that she was experiencing flashbacks from the car accident. (*Id.*). She also noted that her therapist wanted her to stop taking Xanax, but she felt it was helpful. (*Id.*). On examination, she exhibited a mildly dysphoric affect and admitted to suicidal thoughts with no intent; the examination was otherwise unremarkable. (Tr. 844). Dr. Feldman administered cognitive testing; Crismor scored 8/12 on the Hopkins Verbal Learning Test Form 2, and

[1] I summarize only those records relevant to the closed period from December 4, 2013 through June 18, 2019. (*See* Tr. 1377-78, 1346).

performed the MOCA test without errors. (*Id.*). Dr. Feldman declined to increase Crismor's Xanax and recommended follow up in two months. (*Id.*).

On February 13, 2014, Crismor followed up with Dr. Helper for her left knee pain. (Tr. 883). She described that the pain was at a 6/10, radiating from her left knee to her calf, aching, burning, dull, piercing, and throbbing; aggravated by bending, climbing (and descending) stairs, pushing, and walking; and relieved by rest. (*Id.*). Dr. Helper recommended Crismor obtain an EMG nerve conduction study to evaluate her condition and follow up thereafter. (Tr. 885).

On March 6, 2014, Crismor met with Dr. Feldman. (Tr. 1022-29). She reported that she could still hear the crash sounds sometimes but was not otherwise reliving the motor vehicle accident; she had migraine symptoms and felt that her cognition was not great. (Tr. 1029). Dr. Feldman continued all medications. (Tr. 1025).

On March 14, 2014, an EMG of the left lower extremity was performed by Patrick A. Tessman, M.D. (Tr. 892-98). Testing revealed minimal, subacute to chronic lumbosacral radiculopathy affecting the L5 nerve root. (Tr. 895).

On April 9, 2014, Crismor met with Daniel J. Leizman, M.D., at the Cleveland Clinic Pain Management Center for her low back pain extending into the left leg and foot. (Tr. 915). She described that the pain was intermittent, had started in July 2013, and was exacerbated by sitting, standing, lifting, lying down, and walking. (*Id.*). She reported difficulty with bowel and bladder control, fevers, chills, night sweats, and leg weakness. (*Id.*). On examination, straight leg raise was positive to radicular pain on the left; there was no pain to palpation over the spine or costovertebral angles; left sciatic notch was tender; she had moderately decreased lumbar range of motion with pain reproduction. (Tr. 918). Dr. Leizman assessed Crismor with lumbago, left leg pain, lumbar radicular pain, and lumbar disc herniation. (Tr. 918). Dr. Leizman did not feel

opiate use was appropriate for her pain; he started her on meloxicam 15 mg daily as needed; continued Paxil and Xanax; prescribed a home TENS unit, and referred her to physical therapy three times weekly for three weeks, as well as a pain psychologist. (Tr. 918). He ordered x-rays of the lumbar spine and pelvis, as well as an MRI of the lumbar spine, and recommended follow up in two weeks. (*Id.*).

On April 23, 2014, Crismor followed up with the Cleveland Clinic Pain Management Center. (Tr. 922). She reported searing pain of 6/10, and had been unable to attend physical therapy due to pain. (*Id.*). An April 17, 2014 MRI of the lumbar spine showed degenerative changes most severe at L4-L5 and L5-S1. (Tr. 923). On examination, straight leg raise was negative to radicular pain; pain to palpation over the lumbosacral junction; she had moderately decreased lumbar range of motion with pain reproduction. (Tr. 925). Dr. Leizman discontinued meloxicam; started over-the-counter Tylenol and ibuprofen as needed; discontinued the home TENS unit for poor efficiency; again recommended physical therapy; and recommended Crismor return in two weeks for a lumbar steroid injection. (Tr. 926).

On April 30, 2014, Crismor met with Jill Mushkat, Ph.D., for a behavioral medicine pain evaluation. (Tr. 930). She reported a history of anxiety and depression, and pain in her left leg, ranging from 2 to almost 10/10. (*Id.*). She reported that the left leg pain has caused her to stumble and fall; pain killers, lying down, and a heating pad will relieve the pain. (*Id.*). Testing scores suggested severe depression and suicidal ideation, but no intent; and that she saw herself as highly disabled. (Tr. 932). Dr. Mushkat noted Crismor was likely to have a pain disorder with psychological factors. (Tr. 933). She recommended Crismor continue treating with Drs. Feldman and Leizman, and begin treatment at the center, focusing on depression management and suicidal ideation. (Tr. 933).

On May 6, 2014, Crismor underwent an L4-5 interlaminar epidural steroid injection with Dr. Leizman. (Tr. 946-47). She reported her pain was 1/10 after the procedure. (Tr. 947). At follow up on May 20, 2014, Crismor reported her pain was at 4/10 and the injections had provided 50% relief from pain. (Tr. 952).

On June 10, 2014, Crismor underwent a second L4-5 epidural steroid injection with Dr. Leizman. (Tr. 961-63). After the procedure, she reported pain of 0/10. (Tr. 963).

On July 17, 2014, Crismor followed up with Gina Fegatelli, CNP, at the Cleveland Clinic Pain Management Center, and reported 90% relief in symptoms for three weeks after the second injection. (Tr. 977). However, she reported a cramping, electrical, aching pain of 8/10 that day. (*Id.*). CNP Fegatelli continued prior prescriptions and started gabapentin 100 mg three times daily, with a recommendation to follow up in one month. (Tr. 981).

On April 9, 2015, Crismor met with neurologist Gary R. Kutsikovich, M.D., for treatment of post-concussive syndrome and back pain after her motor vehicle accident. (Tr. 942). Dr. Kutsikovich noted a previous brain MRI from June 2014 showed no acute process. (Tr. 943). He recommended obtaining an ambulatory EEG to evaluate post-concussive syndrome, given her reported bouts of confusion, memory loss, dizziness, cephalgia, and blurred vision. (*Id.*). Dr. Kutsikovich noted her history and examination were consistent with post-concussive syndrome, and provided a Medrol dosepak with one refill for her back pain. (Tr. 943). On April 20, 2015, the ambulatory EEG demonstrated intermittent generalized sharp waves which may be consistent of post-concussive syndrome, mildly epileptiform in nature. (Tr. 944).

On October 1, 2015, Crismor met with Dr. Feldman and reported a diagnosis of post-concussive syndrome from her December 2013 accident. (Tr. 1068). She was started on Topamax 50 mg twice daily, and the burning pain had resolved. (*Id.*). Dr. Feldman noted

Crismor demonstrated memory impairment multiple times during his interview. (*Id.*). Crismor also reported flashbacks, ringing in her ears, and songs in her head, as well as increased depression. (*Id.*). Dr. Feldman continued Crismor on Paxil and recommended follow up in four to six weeks. (*Id.*).

On April 20, 2017, Crismor met with Dr. Feldman and reported panic attacks about twice weekly, rage, and homicidal thoughts. (Tr. 1695). She added that she had difficulty walking due to torn ligaments, but was putting off surgery; she also had continued symptoms from the concussion two years earlier. (*Id.*). Dr. Feldman trialed Crismor on Abilify and noted possibly considering an anticonvulsant for rage. (*Id.*).

On May 18, 2017, Crismor met with Dr. Feldman; she believed that the Abilify was working and she was less depressed and not hopeless or suicidal. (Tr. 1700). Dr. Feldman continued Abilify 5 mg daily. (Tr. 1699).

On July 10, 2017, Crismor met with Dr. Helper complaining of severe right hip pain, with weakness and pain in her right lower extremity. (Tr. 1327). Dr. Helper believed them to be claudication type symptomology, including paresthesias, weakness, and dragging her leg; she was unable to walk up stairs or walk any distance without problems. (*Id.*). Dr. Helper noted a history of post-concussion syndrome affecting her right upper extremity, and that she had "extensive brain damage." (*Id.*). Crismor reported difficulty performing her activities of daily living, and that she had fallen three times in the last year. (Tr. 1327, 1329). Dr. Helper reviewed examination and x-ray results, and believed her condition was neurologic in nature; he advised her to follow up with her neurologist. (Tr. 1330).

On September 27, 2017, Crismor met with Alan Cadesky, M.D., who noted she was experiencing food insecurity. (Tr. 1659). She felt as if her legs were losing her strength and

mobility, she was having bad migraines, and she fell down the stairs and hit her head without loss of consciousness. (Tr. 1660). Examination results were largely unremarkable, except for reduced proprioception at both halluces. (*Id.*). Dr. Cadesky assessed her with weakness in both lower extremities and decreased proprioception of the foot joint, noting that these diagnoses were likely a spinal cord problem rather than a central nervous system problem, and planned to check her vitamin B12 levels. (Tr. 1661).

On September 28, 2017, Crismor followed up with Dr. Feldman, (Tr. 1707-17). Crismor reported migraine headaches, worsened post concussion syndrome, tremors, loss of balance, and sleeplessness. (Tr. 1712). Dr. Feldman diagnosed Crismor with postconcussion syndrome, as well as major depressive disorder and panic disorder without agoraphobia. (Tr. 1717). Dr. Feldman continued Crismor on Abilify 5 mg daily; alprazolam .5 mg; and paroxetine hydrochloride 25 mg twice daily. (Tr. 1716).

On October 3, 2017, Dr. Kutsikovich noted Crismor had a history of encephalopathy, confusion, memory loss, and dizziness after a motor vehicle accident. (Tr. 1594). An EEG showed brief intermittent generalized sharp waves consistent with post-concussive syndrome (*Id.*).

On December 21, 2017, Crismor met with Dr. Feldman, reporting that she was feeling much better after starting treatment with a chiropractor; her pain was one or two of ten, down from nine, and she was off gabapentin. (Tr. 1713-18). She had discontinued counseling after multiple provider turnovers. (Tr. 1718). Dr. Feldman continued all medications. (Tr. 1716-17).

On January 31, 2018, Crismor met with Dr. Cadesky, reporting that she continued to have significant problems from her traumatic brain injury, which she described as "total brain damage;

concussion is running my whole body." (Tr. 1666). Examination results were unremarkable. (Tr. 1667). Dr. Cadesky refilled cyclobenzaprine 10 mg. (Tr. 1668).

At an April 5, 2018 visit with Dr. Feldman, Crismor reported that she was diagnosed with facet syndrome L5-S1, which was responsible for a lot of her pain; she also stated she had to reread things to comprehend and had forgetfulness, variable from day to day. (Tr. 1723-24). Dr. Feldman continued all medications. (Tr. 1724).

At a July 5, 2018 visit with Dr. Feldman, Crismor reported having tremors, dropping things, and migraines; she also reported it was harder to complete tasks because of energy, concentration problems, and distraction. (Tr. 1729-30). Dr. Feldman made no medication changes, but noted that Xanax may exacerbate her cognitive impairments. (Tr. 1730).

On September 20, 2018, Crismor followed up with Dr. Kutsikovich for post concussion syndrome, and reported confusion, memory loss, and dizziness. (Tr. 1593). Dr. Kutsikovich noted that on examination, Crismor required repetition and had difficulty with complex commands, but motor examination was 5/5 strength throughout and steady gait. (*Id.*). Dr. Kutsikovich continued Crismor on Topamax 100 mg daily for headache. (*Id.*).

On October 25, 2018, Crismor met with Dr. Feldman, who noted she had difficulty with word finding. (Tr. 1736). Crismor reported that recent testing revealed poor executive function, and lowered focus and IQ from earlier scores. (*Id.*). Dr. Feldman continued Crismor on Abilify, but with a note that she could try a reduced dosage. (Tr. 1734, 1736).

On January 17, 2019, Crismor met with Dr. Feldman, noting that she had reduced side effects from the lowered dose of Abilify. (Tr. 1742). Dr. Feldman made no medication changes and recommended follow up in three months. (*Id.*).

**C. Medical Opinion Evidence**

**1. State Agency Reviewing Opinions**

On November 19, 2013, at the initial level, state agency reviewing physician Diane Manos, M.D., opined that Crismor could perform light work, but with additional limitations to include standing and walking four hours and sitting six hours in an eight-hour work day; occasionally kneeling, crawling, climbing ramps and stairs, and balancing; never climbing ladders/ropes/scaffolds; unlimited crouching; and avoiding all exposure to hazards, including no unprotected heights. (Tr. 330-31). Also at the initial level on November 19, 2013, state agency psychological reviewer Frank Orosz, Ph.D., opined Crismor was moderately limited in sustaining concentration and persistence, but could adjust to normal stressors and changes in routine. (Tr. 332-33).

On May 28, 2014, on reconsideration, Abraham Mikalov, M.D., largely adopted Dr. Manos' opinion, with the additional limitations of occasional crouching, and occasional push/pull of her bilateral lower extremities. (Tr. 362-63). On reconsideration, Karla Voyten, Ph.D., adopted Dr. Orosz's opinion. (Tr. 365-66).

**2. Treating Provider Opinions**

On May 18, 2017, Dr. Feldman completed a mental residual functional capacity questionnaire. (Tr. 1310-15). In it, he noted diagnoses of depression, panic disorder, PTSD, and post concussion syndrome, and that she had improved mood but remained cognitively impaired and in frequent pain. (Tr. 1310). She had difficulty retaining information and concentrating. (*Id.*). Dr. Feldman opined that Crismor had close to or no useful ability to function in completing a normal workday without interruption from psychologically based symptoms and performing at a consistent pace, and in understanding, remembering, and carrying out detailed instructions, interacting appropriately with the general public; or dealing with the stress of skilled and

semiskilled work. (Tr. 1312-13). She could not meet competitive standards in remembering work-like procedures or short and simple instructions; maintaining attention for two-hour segments; dealing with normal work stress; setting realistic goals or making plans independently of others. (*Id.*). Dr. Feldman opined Crismor had a low IQ or reduced intellectual functioning, explaining that she had a significant fall from her prior level. (Tr. 1313).

**D. Administrative Hearing Evidence**

On October 7, 2025, Crismor testified at a hearing before ALJ Hajjar. (Tr. 1373-95). She testified that during the closed period from December 2013 through June 2019, she slept often, had migraine headaches with blurred vision, ringing in her ears, was in severe pain, and lost control of her bladder, which she related to post concussion syndrome. (Tr. 1383-84). She was restricted from doing household chores, so her daughters took care of the house. (Tr. 1384). Crismor was a church member but could not go due to migraines. (Tr. 1385). By 2019, her condition had improved enough to go back to work. (Tr. 1384-85).

Crismor treated with psychiatrist Dr. Feldman; she described symptoms of depression, fits of crying, fits of rage, and panic attacks. (Tr.1386). She had panic attacks several times a day. (Tr. 1387). Crismor had erratic mood swings and felt she could not get control of her emotions. (Tr. 1386). She took Abilify, but had to reduce the dosage after the right side of her face started drooping. (*Id.*).

She described a bad ankle and that her hip was dislocated after a fall, causing severe pain in her legs. (*Id.*). She took epidurals for the pain, but she could not get relief after a period of time; she took gabapentin, but that also made her woozy and may have contributed to her sleepiness; she then was treated by a chiropractor. (Tr. 1387-88).

She had daily migraines; for relief, she would sleep in a dark room without light or sound and took Topamax. (Tr. 1388).

The VE then testified. (Tr. 1389). Crismor had no past relevant work, although starting after the closed period, she worked as a title clerk, DOT #203.582-066, sedentary, SVP 3, and as a license clerk, DOT #205.367-034, light, SVP 3. (Tr. 1389-90).

The ALJ presented the following hypothetical: an individual of Crismor's age and education with no past work experience, and who can perform light work with additional limitations including occasionally pushing and pulling with the bilateral lower extremities; and climbing ramps and stairs, but never climb ladders, ropes, or scaffolds; can frequently balance; occasionally stoop, kneel, crouch and crawl; never work in high exposed places and can never work in proximity to moving mechanical parts; can perform work without a specific production rate pace, such as assembly line or hourly production quotas; and can deal with frequent changes in routine work settings. (Tr. 1390). The VE testified that the hypothetical individual could work in the following light, SVP 2 jobs: routing clerk, DOT #222.687-022, 121,000 jobs in the national economy; assembler, DOT #739.367-030, 29,000 jobs in the national economy; and cleaner/housekeeper, DOT #323.687-014, with 191,000 jobs in the national economy. (*Id.*). The hypothetical individual could also perform the title clerk and license clerk jobs previously discussed. (Tr. 1390-91).

The ALJ provided a second hypothetical, modified to limit standing and walking to four hours, and adding mental limitations of only occasional interactions with supervisors, coworkers and the public and can only deal with occasional changes in a routine work setting. (Tr. 1391). The VE responded that the routing clerk job previously identified would remain, but the available jobs in the national economy would be reduced by 50% to accommodate the four hours

of standing. (Tr. 1392). He identified two additional light, unskilled jobs: copy machine operator, DOT #207.685-014, with 4,800 jobs in the national economy; and order caller, DOT #209.667-014, with 9,100 jobs in the national economy. (*Id.*).

The VE also testified that the tolerance for absenteeism is once per month; the threshold for off-task behavior is no more than 15% percent of the day, any more than that precludes sustained work activity. (Tr. 1392-93).

## IV. The ALJ's Decision

> **1.** The claimant meets the insured status requirements of the Social Security Act through December 31, 2029.
>
> **2.** The claimant engaged in substantial gainful activity (SGA) during the following periods: July 2, 2019, through the date of this decision (20 CFR 404.1520(b), 404.1571 et seq., 416.920(b) and 416.971 et seq.).
>
> **3.** However, there has been a continuous 12-month period(s) during which the claimant did not engage in substantial gainful activity. The remaining findings address the period(s) the claimant did not engage in substantial gainful activity.
>
> **4.** The claimant has the following severe impairments: Traumatic brain injury, disorder of the spine, degenerative joint disease of knees and ankles, depressive disorder and anxiety disorder (20 CFR 404.1520(c) and 416.920(c)).
>
> **5.** The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).
>
> **6.** After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except sitting for 6hrs, standing and/or walking for 4hrs; push/pull as much as can lift/carry; occasionally push/pull with bilateral lower extremities. Can never climb ladders, ropes, or scaffolds; can frequently balance, can climb ramps and stairs occasionally, occasionally stoop, kneel, crouch, and crawl. Can never work in high, exposed places, never have proximity to moving mechanical parts. Can perform work without a specific production rate pace, such as an assembly line or hourly production quotas. Is able to interact with Supervisors, coworkers and the public occasionally. Deal with occasional changes in a routine work setting.

**7.** The claimant has no past relevant work (20 CFR 404.1565 and 416.965).

**8.** The claimant was born on December 1, 1972, and was 39 years old, which is defined as a younger individual on the alleged disability onset date. The claimant's age changed to an individual closely approaching advanced age on November 30, 2022 (20 CFR 404.1563 and 416.963).

**9.** The claimant has at least a high school education (20 CFR 404.1564 and 416.964).

**10.** Transferability of job skills is not an issue because the claimant does not have past relevant work (20 CFR 404.1568 and 416.968).

**11.** Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569a, 416.969, and 416.969a). 12. The claimant has not been under a disability, as defined in the Social Security Act, from January 1, 2012, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

(Tr. 1348-62).

## V. Law & Analysis

### A. Standard for Disability

Social Security regulations outline a five-step process the ALJ must use to determine whether a claimant is entitled to benefits:

1. whether the claimant is engaged in substantial gainful activity;
2. if not, whether the claimant has a severe impairment or combination of impairments;
3. if so, whether that impairment, or combination of impairments, meets or equals any of the listings in 20 C.F.R. Part 404, Subpart P, Appendix 1;
4. if not, whether the claimant can perform their past relevant work in light of his RFC; and
5. if not, whether, based on the claimant's age, education, and work experience, they can perform other work found in the national economy.

20 C.F.R. § 404.1520(a)(4)(i)-(v); *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 642-43 (6th Cir. 2006). The Commissioner is obligated to produce evidence at Step Five, but the claimant bears

the ultimate burden to produce sufficient evidence to prove they are disabled and, thus, entitled to benefits. 20 C.F.R. § 404.1512(a).

**B. Standard of Review**

This Court reviews the Commissioner's final decision to determine whether it is supported by substantial evidence and whether proper legal standards were applied. 42 U.S.C. § 405(g); *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007). However, the substantial evidence standard is not a high threshold for sufficiency. *Biestek v. Berryhill*, 587 U.S. 97, 103 (2019). "It means – and means only – 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Id.* quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938). Even if a preponderance of the evidence supports the claimant's position, the Commissioner's decision cannot be overturned "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

Under this standard, the court cannot decide the facts anew, evaluate credibility, or re-weigh the evidence. *Id.* at 476. And "it is not necessary that this court agree with the Commissioner's finding," so long as it meets the substantial evidence standard. *Rogers*, 486 F.3d at 241. This is so because the Commissioner enjoys a "zone of choice" within which to decide cases without court interference. *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986).

Even if substantial evidence supported the ALJ's decision, the court will not uphold that decision when the Commissioner failed to apply proper legal standards, unless the legal error was harmless. *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("[A] decision . . . will not be upheld [when] the SSA fails to follow its own regulations and that error prejudices a claimant on the merits or deprives the claimant of a substantial right."); *Rabbers v.*

*Comm'r Soc. Sec. Admin.*, 582 F.3d 647, 654 (6th Cir. 2009) ("Generally, . . . we review decisions of administrative agencies for harmless error."). Furthermore, this Court will not uphold a decision when the Commissioner's reasoning does "not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011). Requiring an accurate and logical bridge ensures that a claimant and the reviewing court will understand the ALJ's reasoning, because "[i]f relevant evidence is not mentioned, the court cannot determine if it was discounted or merely overlooked." *Shrader v. Astrue*, No. 11-13000, 2012 WL 5383120, at *6 (E.D. Mich. Nov. 1, 2012); *see also Bowen v. Comm'r of Soc. Sec.,* 478 F.3d 742, 749 (6th Cir. 2007).

## VI. Discussion

Crismor brings one issue for this Court's review: whether the ALJ supported his decision with substantial evidence when the RFC did not accurately reflect her functioning and he did not properly evaluate her allegations under SSR 16-3p. (ECF Doc. 9, p. 9). She argues the ALJ erred "in that he failed to incorporate [her] inability to sustain gainful employment," that he failed to consider that she was unable to sustain full-time work for eight hours a day, five days a week, and that the VE testified that being absent once per month[2] is work preclusive. (*Id.* at p. 12). According to Crismor, the ALJ's decision failed to build an accurate and logical bridge where she had "ongoing and persistent symptoms of confusion, poor memory, chronic pain, fatigue, migraine headaches, etc." (*Id.* at p. 13). She also contends that the ALJ erred by not meaningfully discussing all factors SSR 16-3p requires, and the decision does not provide specific reasons for his findings. (*Id.* at pp. 14-16).

[2] The VE testified that more than one absence per month is work-preclusive. (Tr. 1392).

The Commissioner responds that the ALJ properly considered Crismor's subjective complaints in accordance with SSR 16-3p, and it is for the ALJ, not a reviewing court, to judge the consistency of her statements with the record. (ECF Doc. 10, p. 10). The Commissioner provides references from the ALJ where he considered her statements of pain, memory loss, and the effects of her post-concussive symptoms, in conjunction with a review of the medical record, and the activities she could perform, such as performing in her church choir. (*Id.* at p. 11). In all, the Commissioner's view is that Crismor's arguments ask the Court to reconsider the evidence, which it may not do. (*Id.* at p. 13). Even taking Crismor's argument regarding the ALJ's failure to meaningfully explain the decision as true, a reviewing court must uphold the ALJ's decision if its "path may reasonably be discerned." (*Id.* at p. 15 (quoting *Garland v. Dai*, 593 U.S. 357, 369 (2021)).

Although Crismor presents, in part, that the ALJ erred in his RFC assessment, a review of her brief reveals little supporting argument that the RFC itself does not reflect her limitations. (*See* ECF Doc. 9, pp. 9-16). Rather, the issues raised and arguments fleshed out focus on the ALJ's consideration of her subjective symptoms, including whether the effects of her post concussion syndrome permit her to sustain full-time employment without requiring significant absences. (*See id.* at p. 12 (citing to 20 C.F.R. § 404.1545(a)(1)-(5) and describing that an ALJ must base a claimant's RFC on "all relevant evidence in the record, including the claimant's description of her limitations, subjective symptoms," and other relevant medical evidence.)). Because the RFC portion of Crismor's argument can be resolved by addressing the subjective symptom statement argument under SSR 16-3p, I do not separately address whether the RFC assessment itself was supported by substantial evidence. *See McPherson v. Kelsey*, 125 F.3d 989, 995-96 (6th Cir. 1997).

I now turn to whether the ALJ properly considered Crismor's subjective symptoms in accordance with the regulations.

SSR 16-3p defines a two-step process in evaluating an individual's symptoms. First, it must be determined whether the individual has a medically determinable physical or mental impairment that could reasonably be expected to produce the individual's alleged symptoms. SSR 16-3p, 82 Fed. Reg. 49462, 46463; *Simon v. Comm'r of Soc. Sec.*, 5:23-cv-0013, 2024 WL 4025780, at *11 (N.D. Ohio Sept. 3, 2024). If that requirement is met, the second step is to evaluate the intensity and persistence of the claimant's symptoms to determine the extent to which they limit the claimant's ability to perform work-related activities. (*Id.*). There is no dispute that the ALJ identified several severe physical impairments, thereby meeting the first step of the SSR 16-3p analysis. (*See* Tr. 1349). Accordingly, the discussion here will focus on the ALJ's compliance with the second step.

The evaluation of a claimant's subjective complaints rests with the ALJ. *Rogers*, 486 F.3d at 248. In evaluating a claimant's symptoms, the ALJ must look to medical evidence, statements by the claimant, other information provided by medical sources, and any other relevant evidence on the record. 20 C.F.R. § 404.1529(c); SSR 16-3p, 2017 WL 5180304. Factors relevant to a claimant's symptoms include daily activities, types, and effectiveness of medications, treatment received to address symptoms, and other factors concerning a claimant's functional limitations and restrictions due to pain or other symptoms. *Id.*

Beyond medical evidence, SSR 16-3p sets forth seven factors that the ALJ should consider: daily activities; location, duration, frequency, and intensity of the pain or other symptoms; factors that precipitate and aggravate the symptoms; type, dosage, effectiveness, and side effects of medication to alleviate pain or other symptoms; treatment other than medication;

any measures other than treatment the individual uses to relieve symptoms; and any other factors concerning the individual's functional limitations and restrictions. 2017 WL 5180304, at *7-8. The ALJ need not analyze all seven factors but should show that she considered the relevant evidence. *See Cross v. Comm'r of Soc. Sec.*, 373 F. Supp. 2d 724, 733 (N.D. Ohio 2005). SSR 16-3p states:

> [I]f an individual's statements about the intensity, persistence, and limiting effects of symptoms are inconsistent with the objective medical evidence and the other evidence, we will determine that the individual's symptoms are less likely to reduce his or her capacities to perform work-related activities or abilities to function independently, appropriately, and effectively in an age-appropriate manner.

The ALJ's "decision must contain specific reasons for the weight given to the individual's symptoms . . . and be clearly articulated so the individual and any subsequent reviewer can assess how the adjudicator evaluated the individual's symptoms." SSR 16-3p, 2017 WL 5180304; *see also Felisky v. Bowen*, 35 F.2d 1027, 1036 (6th Cir. 1994) ("If an ALJ rejects a claimant's testimony as incredible, he must clearly state his reason for doing so."). While a reviewing court gives deference to an ALJ's credibility determination, "the ALJ's credibility determination will not be upheld if it is unsupported by the record or insufficiently explained." *Carr v. Comm'r of Soc. Sec.*, No. 3:18CV1639, 2019 WL 2465273, at *10 (N.D. Ohio April 24, 2019) citing *Rogers*, 486 F.3d at 248-49), *report and recommendation adopted*, 2019 WL 3752687 (N.D. Ohio Aug. 8, 2019).

Here, the ALJ described Crismor's limitations during the relevant period as follows:

> The claimant testified that she was not working in December 2013, due to migraine headaches, seeing spots, blurred vision, ringing in her ears and severe pain from injuries she sustained from an accident. She stated that the main problem was post-concussion syndrome and loss of control of her bladder. She was not able to do much and her psychiatrist told her she needed to see a neurologist. She stated that she was restricted and her daughter cleaned the house. She listened to audiobooks and attended church but not regularly.

(Tr. 1351). The ALJ continued,

> She stated that significant factors that held her back most of the time were headaches, sleeping, migraines, blurred vision, ringing in her ears and loss of bladder control. She stated that she had bouts of depression, crying, rage, panic attacks and was scarred (*sic*) and overwhelmed. . . . She had panic attacks several times a day and she had no energy to do anything. She has a bad ankle which is now exacerbated up to her hip. She fell down some stairs and dislocated her hip which caused severe pain in her legs. She cannot run and could barely walk 200 feet without stopping to rest and it was like that ten years ago.

(*Id.*). In these statements, the ALJ is referring to Crismor's own statements of her condition, its effects, and the limitations she has as a result. While not verbatim, it appears that the ALJ is nearly quoting her hearing testimony in these paragraphs. (*Compare id. with* Tr. 1383-88).

The ALJ also considered Crismor's statements of the efficacy of her treatments:

- "She could not get hold of her emotions and had mood swings. She was taking medications between 2014 and 2019." (Tr. 1351).
- "She received epidurals and had pain therapy which did not help and she was put on gabapentin that made her have mood problems." (*Id.*).
- "She had daily migraines and would sleep in a dark room. She was put on Topamax but before that she could not see, she had blurred vision, and ringing in her ears." (Tr. 1352).

In contrast with these effects, the ALJ also considered medical evidence supporting the allegations of post-concussion syndrome and traumatic brain injury:

> I considered the claimant's statements about the intensity, persistence, and limiting effects of her symptoms; however, the evidence is inconsistent with the claimant's testimony regarding her inability to perform any work attributed to her impairments.
>
> As for post-concussion syndrome, attributed to a traumatic brain injury, imaging of claimant's brain has been unremarkable. Although the claimant was involved in a motor vehicle accident on December 4, 2013, when she was T boned by another vehicle, she was a restrained driver and denied loss of consciousness. However, she complained of neck discomfort and upper quadrant abdominal pain (C5F/16). On arrival to the emergency room, she was fully oriented and on physical examination she had tenderness in her left upper quadrant. (C5F/18). However, there were no neurological deficits, or evidence of acute blood loss, and imaging by CT scan of her brain was negative as well as a CT scan of her abdomen. A CT scan of her spine

> showed cervical spondylosis without evidence of a fracture. Furthermore, physical examination was unremarkable for acute injuries or treatment requiring admission (C5F/22). Therefore, she was discharged home.

(Tr. 1352).

> While imaging of her lumbar spine was negative for cord impingement or compression, examination was also unremarkable for significant limitation with ambulation on April 23, 2014. She expressed having pain to palpation over the lumbosacral junction and examination was notable for decreased lumbar range of motion. However, she had a negative SLR, there was no instability or laxity in all four extremities, she had normal strength in her upper and lower extremities, and no atrophy or neurological deficits. Moreover, she had a normal gait.

(Tr. 1353). The ALJ also considered Crismor's self-reports in the context of her behavioral medicine visits, and the provider's assessments of those reports:

> The claimant reported problems with her memory and concentration as well as mood changes, frustration, agitation, anxiety and depression. She had thoughts of suicidal ideation without a plan. Nonetheless, the claimant reported singing in the church choir, activities with the Historical Society, listening to audio books and watching historical DVDs. On the other hand, she did not think she was capable of handling a job anymore mentally and did not trust herself to drive. The claimant's scores in the Beck Depression Inventory (BDI)and Pain Disability Index (PDI), both self-reported questionnaires, showed severe depression with suicidal ideation and no intent, and the PDI suggests that she saw herself as highly disabled noting the Personality Assessment Inventory appeared to be a cry for help. Dr. Conomy assessed that the claimant saw herself as healthy but noted that she was highly focused on her symptoms.

(Tr. 1353). The ALJ concluded his review with the following explanation:

> While the claimant reports having total brain damage (C37F/69) with difficulty in memory and cognitive limitations, the evidence persistently shows a normal CT of the head. There are some findings on EEG that are mildly epileptiform in nature, there is no evidence of seizures. Nonetheless, I considered evidence of the claimant requiring repetition and limitation with complex demands in limiting the claimant to work without specific production rate pace or hourly quotas. Overall, the claimant retained a normal gait for the most part, and a cane or an assistive device is not obligatory noting that the use of a cane was infrequent. However, due to degenerative joint disease with evidence of imaging of her knee and ankle, I limited walking/standing to 4 hours as well as provided postural changes as occasional. While the evidence does reference some issues with balance, I provided frequent balancing and precluded hazards related to climbing ladders, ropes and scaffolds, as well as high exposed places and proximity to moving mechanical parts.

> As for her complaints of headaches, the evidence does not fully support the frequency or duration of her migraines asserted by the claimant. Although she reported symptoms and noted decrease in her headaches with medication, there is limited evidence other than her statements in support of migraines.
>
> While the claimant testified that her main problem was post-concussion syndrome and loss of control of her bladder, the claimant did not report use of pads for incontinence until 2017 and was ordered urodynamics for stress urinary incontinence (37F/32). A cystometrogram showed leakage with coughing (C37/41). Otherwise, she denied dysuria, urinary frequency, or incontinence on May 22, 2019 (C37F/85).
>
> As for psychological limitations, the claimant struggled with anxiety and depression; however, she responded to medication and retained the ability to work within a setting without productivity demands or more than frequent changes in routine.

(Tr. 1356). In all, the ALJ provided a thorough discussion of Crismor's subjective symptoms, their effect on her mental and physical well-being, the efficacy of treatment, and a number of other factors. The ALJ provided a balanced review of the record, noting periods of decompensation and that treatments at times were ineffective, but also noting where examination results were unremarkable, or where imaging did not reveal the severity of symptoms alleged. This review meets what is required under SSR 16-3p, and more than that, it provides sufficient explanation to guide my review. I find no error.

I therefore recommend the district court affirm.

## VII. Recommendation

Because the ALJ applied proper legal standards and reached a decision supported by substantial evidence, I recommend that the Commissioner's final decision denying Crismor's applications for DIB and SSI be affirmed.

Dated: November 23, 2026

Reuben J. Sheperd
United States Magistrate Judge

## OBJECTIONS

**Objections, Review, and Appeal**

Within 14 days after being served with a copy of this report and recommendation, a party may serve and file specific written objections to the proposed findings and recommendations of the magistrate judge. Rule 72(b)(2), Federal Rules of Civil Procedure; *see also* 28 U.S.C.§ 636(b)(1); Local Rule 72.3(b). Properly asserted objections shall be reviewed de novo by the assigned district judge.

* * *

Failure to file objections within the specified time may result in the forfeiture or waiver of the right to raise the issue on appeal either to the district judge or in a subsequent appeal to the United States Court of Appeals, depending on how or whether the party responds to the report and recommendation. *Berkshire v. Dahl*, 928 F.3d 520, 530 (6th Cir. 2019). Objections must be specific and not merely indicate a general objection to the entirety of the report and recommendation; "a general objection has the same effect as would a failure to object." *Howard v. Sec'y of Health and Hum. Servs.*, 932 F.2d 505, 509 (6th Cir. 1991). Objections should focus on specific concerns and not merely restate the arguments in briefs submitted to the magistrate judge. "A reexamination of the exact same argument that was presented to the Magistrate Judge without specific objections 'wastes judicial resources rather than saving them, and runs contrary to the purpose of the Magistrates Act.'" *Overholt v. Green*, No. 1:17-CV-00186, 2018 WL 3018175, *2 (W.D. Ky. June 15, 2018) quoting *Howard*. The failure to assert specific objections may in rare cases be excused in the interest of justice. *See United States v. Wandahsega*, 924 F.3d 868, 878-79 (6th Cir. 2019).
under